VILLAGE OF HAMTRAMCK v. SIMONS.

1. EMINENT DOMAIN—PUBLIC NECESSITY—HIGHWAYS AND STREETS —CHANGED CONDITIONS.

Where proceedings were inaugurated by a village council by resolution under Act No. 176, Pub. Acts 1903 (1 Comp. Laws 1915, § 2784 et seq.), to condemn a strip of land 11 feet wide adjoining a public highway on the west, the subsequent action of property owners on the west dedicating a strip 50 feet wide for street purposes would not affect the proceedings or the necessity for widening the

See note in 22 L. R. A. (N. S.) 1, 111.

original street, since, with the 11-foot strip between, it would remain the same width as originally.

2. SAME—MUNICIPAL CORPORATIONS—RESCISSION.

Where the council at no time rescinded its resolution or took official action to discontinue the condemnation proceedings by reason of the changed conditions, the questions of public necessity and compensation were for the jury; and the court was not divested of jurisdiction by subsequent events.

3. SAME—EVIDENCE.

The fact that streets had been dedicated adjoining the 11-foot strip was competent evidence for the jury to consider in determining the public necessity of widening the original street, and of taking the strip for that purpose.

4. SAME—CONSTITUTIONAL LAW—JUDICIAL QUESTION.

The question of the necessity for taking the strip as well as the just compensation to be made therefor was properly for the jury under Act No. 176, Pub. Acts 1903 (1 Comp. Laws 1915, § 2784 *et seq.*), which was not in conflict with article 13, § 1, of the Constitution.

5. SAME—EVIDENCE—SUFFICIENCY.

Evidence of necessity *held*, sufficient to carry that issue of fact to the jury.

6. SAME—COMPENSATION—NEW TRIAL—OVERWHELMING WEIGHT OF EVIDENCE.

Where the testimony as to the value of the strip was very conflicting, there being abundant testimony, if believed, to sustain a verdict for less than the amount awarded, as well as for more, the verdict for $2,500 was not so grossly against the overwhelming weight of evidence as to demand reversal.

Case-made from Wayne; Hosmer, J. Submitted January 24, 1918. (Docket No. 177.) Decided June 3, 1918.

Condemnation proceedings in justice's court by the village of Hamtramck against David W. Simons for the widening of a street. There was judgment for plaintiff, and defendant appealed to the circuit court. Judgment for plaintiff. Defendant appeals. Affirmed.

*James O. Murfin,* for appellant.

*Seneca C. Traver (Ignatius J. Salliotte,* of counsel), for appellee.

STEERE, J. On February 27, 1913, the village council of Hamtramck inaugurated by resolution proceedings to condemn a strip of land belonging to defendant 11 feet in width and about 2,600 feet long lying adjacent on the west to Joseph Campau avenue, for the purpose of widening that thoroughfare between Caniff avenue and Carpenter avenue. On petition of the village attorney, filed March 3, 1913, a jury was summoned and impaneled by a justice of the peace of Hamtramck township to determine the questions of necessity and compensation. On May 2, 1913, hearing was had and a verdict rendered by the jury so impaneled finding it necessary to take the property in question "for the use and benefit of the public," and awarding the defendant $1,250 as compensation therefor. Judgment was entered by said justice confirming such determination and award. On May 26, 1913, appeal was taken by defendant to the circuit court of Wayne county where the issue was brought to trial before a jury on August 5, 1915, resulting in a verdict determining it "necessary to take the private property described in the petition in the cause for the use and benefit of the public for the proposed public improvement," and awarding to defendant as just compensation $2,225, upon which judgment of confirmation was entered by the court. Defendant then moved the court to set aside the verdict and award, which was denied and an appeal was thereafter taken to this court on errors assigned.

The three reasons argued in defendant's brief against the verdict and confirmation complained of are thus stated:

"1. The village council never passed upon the necessity for a street 111 feet wide.

"2. The record affirmatively shows no necessity in the village of Hamtramck for a street 111 feet wide.

"3. The award of $2,225 was so conspicuously inadequate and contrary to the weight of the evidence as to amount to confiscation."

These proceedings were taken by the village authorities under Act No. 176, Pub. Acts 1903 (1 Comp. Laws 1915. § 2784 *et seq.*) by which villages are authorized to take private property for public use when the necessity is determined and compensation awarded as provided, one specified use being "for the purpose of opening, widening, altering and extending streets."

The village of Hamtramck is a suburb of Detroit, directly adjoining that city on the north with blending intercourse of population and municipal activities, but retaining its corporate boundaries and organization as a municipality for local governmental purposes. Joseph Campau avenue is a prominent thoroughfare of Detroit which, commencing at the Detroit river, extends north through that city to the southern boundary of Hamtramck and, under the same name, continues on north through that village, in which it is said to be the principal business street. The business portion is chiefly, if not entirely, south of Caniff avenue, up to which it is 66 feet wide. Beyond Caniff to the north it is, or was when these proceedings were begun, but 50 feet wide between Caniff and Carpenter avenues. The narrow strip of land 11 feet wide sought to be condemned, lying immediately adjoining Joseph Campau avenue on the west and extending north and south between the two avenues, belonged to defendant. West of this strip the land belonged to others who it was shown were somewhat actively interested in promoting the condemnation, a Mr. O'Connor who was interested in subdivisions lying west of this strip filing a

petition with the village council which inaugurated the action.

Defendant had owned this strip for 27 or 28 years. It was originally part of a tract which he platted in 1888 into a subdivision to the east of and including Joseph Campau avenue. He testified that practically all lots in the subdivision had been sold and passed into other hands, "that is on that frontage," and in explanation of the strip in question said:

"I was connected at one time with the company that first promoted that car line out there. When I recorded my plat and this lot was fixed in the location it was, I now recall the circumstances that brought about this condition. I made an effort to induce the parties who owned the land on the west side of my property to join me in then and there making as a part of my plat a substantial street. They refused. That was the reason I was unable to make my plat just the way I wanted it at the time I recorded this plat."

Some time before this case was retried in circuit court, and as stated in defendant's brief about six months after condemnation proceedings were inaugurated by the village, the owners platted and subdivided the land to the west of this strip between Caniff and Carpenter avenues and opened a 50 foot street along their east front adjoining it, leaving the strip between two 50-foot streets so that the result of its condemnation is a street 111 feet wide. This counsel contends was never passed upon or determined to be a necessity by the village council, which only determined the necessity of and intended to widen Joseph Campau avenue to a street 61 feet wide.

The village engineer who prepared the map attached to the petition showing surrounding conditions and the proposed widening testified that there had already been 50 feet given on the other side of the strip, and when disputed by counsel for defendant who said

"that was not acquired until six months after—the Croul-Moran plat," testified, "the plan of it shows practically half the way up there was 100 feet already dedicated." It was shown that the Moran & Croul subdivision was recorded August 15, 1915, and the O'Connor subdivision in February, 1913, which together include the street to the west of this strip, as is inferable from the evidence although the plats and plans referred to are not in the record or files of the case. Just what information the council had before it when the resolution of necessity for condemnation was passed on February 27, 1913, is not shown, but its determination was directed to the 11-foot strip described by metes and bounds, which yet restricts the widening of Joseph Campau avenue as before, followed by commencement of condemnation proceedings in March, 1913, and judgment in justice's court confirming the finding and award of a jury in May, 1913. Presumably the village authorities had knowledge of the subdivisions platted and streets dedicated within their municipal boundaries, as the duty rested upon the municipality to care for its highways. The council at no time rescinded its resolution or took official action to discontinue the condemnation proceedings by reason of changed conditions. Its determination of necessity was but an initiative jurisdictional prerequisite. Final determination of public necessity and compensation were for a jury, upon the facts shown at the hearing. The question of public necessity for taking that strip for the proposed improvement was put in issue by these proceedings and the court was not divested of jurisdiction by subsequent events. It remained, as before, for plaintiff to show to the jury upon the hearing by a preponderance of evidence that the necessity existed, and upon that issue the defense might show that there never was any necessity or that it no longer existed. Defendant was not restricted in

testimony or argument to the jury along those lines, so far as appears.

The fact that streets had been dedicated adjoining this strip against which condemnation was directed was before the jury as competent evidence to consider in determining the public necessity of widening Joseph Campau avenue and of taking this strip for that purpose.

It is also urged upon the showing made, a verdict should have been directed for defendant since our Constitution authorizes such taking of private property only in case of necessity, and where it is so provided "the necessity becomes a judicial question," citing 4 McQuillan on Municipal Corporations, § 1467. But our Constitution provides (Art. 13, § 1):

"Private property shall not be taken by the public nor by any corporation for public use without the necessity therefor being first determined and just compensation being first made or secured in such manner as shall be prescribed by law."

The statute under which these proceedings were brought provides that the necessity therefor shall be determined by a jury and prescribes the form of oath to be administered. In *Commissioner of Parks, etc., of Detroit* v. *Moesta,* 91 Mich. 149, a local condemnation act was held constitutional which committed the question of necessity to a jury which should be "sworn to ascertain and determine the necessity for taking the several parcels of land sought to be taken for the purpose set forth in the petition, and, if taken, to determine and award to each person entitled thereto the proper compensation to be allowed," etc., the court saying that "the question of necessity for taking the property, including the public necessity for making the improvement, is as fully committed to the jury as is the question of compensation." Upon the issue of necessity the court said:

"In order to justify a finding of necessity, it must appear that the improvement was a convenience,—a benefit to the public of sufficient importance to warrant the public in incurring the expense in making it."

Upon this subject the trial court instructed and cautioned the jury in part as follows:

"It can never be just to take property under pretext of public benefit, which is not needed by the public, however much it may advance interests in which the public have no concern, and it can never be legal to compel any man to give up his property when it is not needed or to lose it whether needed or not without being made whole. The Constitution does not allow property to be taken unless there is a public necessity for it, and this must be a real necessity. There is no question about that. I do not mean, gentlemen of the jury, by the words 'real necessity' that it would be impossible for the people to use the street. I do not mean that it must be shown that the growth of Hamtramck or the surrounding country would be limited by reason of that, but there must be a really public convenience before the property should be taken."

Upon the question of necessity the existing conditions at the time of the trial were fully gone into and testimony was produced by plaintiff to the effect that the widening of Joseph Campau avenue as proposed would give more convenient access to that thoroughfare from the west in that section, on which were the only street car facilities to the city; that the fire department would secure better facilities for service against fire in that vicinity, owing to the location of hydrants, and other embarrassments from the then condition of the street which could be obviated if it was widened; that better and more direct access to schools would be afforded children in that locality, and if the street was widened it could be paved, sidewalks laid along it and conditions for traffic and travel improved for the convenience and safety of the public,

to greater advantage than with its present width. We think the evidence of necessity was ample to carry that issue of fact to the jury. *City of Detroit* v. *Brennan & Co.*, 93 Mich. 338. In denying defendant's motion to set aside the verdict the learned trial judge who had knowledge of the locality and heard the witnesses testify said:

"I think there is no question but what there would be a great improvement so far as the public is concerned in the acquisition of this strip as a part of the public highway and I am satisfied that the public necessity exists therefor."

It is further urged that the award was so inadequate and contrary to the weight of evidence as to amount to confiscation. As to the official appraisement of presumably disinterested persons selected according to law and sworn to well and truly determine the question, 12 freeholders "residing in the vicinity of the property," selected as most satisfactory to the parties of the 24 summoned before the justice's court, awarded as just compensation $1,250. Upon retrial in the circuit court 12 more jurors "freeholders of the county residing in the vicinity of the property," selected from 24 summoned as the statute prescribes, awarded $2,225 as in their judgment just compensation. On appeal to the circuit court defendant claimed the value was "to wit, the sum of fifteen thousand eight hundred and forty dollars ($15,840).

As to the value of this 11 feet wide strip, eight real estate agents and dealers residing in Detroit, including plaintiff, gave presumably expert testimony ranging in appraisement of the property at from $600 to $26,640. Four of these put the value below the amount awarded by the jury. Defendant's witnesses made their estimates mainly on a front foot basis as affording available sites for business buildings, varying somewhat according to their optimism in that par-

ticular. One other witness, residing in Highland Park, not engaged in the real estate business but who owned real estate in Hamtramck and had sold a few lots there, for one of which he got "about $40 a foot," thought this strip would sell at "from $8 to $10 a foot running along." There was a conflict of testimony as to whether a strip of that width and so located could be profitably utilized or had any value for business buildings, should a demand for business locations develop in that locality.

Stress was laid by defendant on a land contract he was permitted to introduce in evidence by which it is shown he sold 450 feet of this strip to a prominent real estate operator in Detroit for $4,000, one hundred dollars down, and the balance in deferred payments of ten dollars a month or more. This contract was dated July 20, 1914, after this proceeding had been heard in justice's court and was pending on appeal by defendant. But one deferred payment of $10 is shown to have been made. The purchaser when called as a witness by defendant appraised the strip at $5 per foot, but testified he had never sold a lot out there, and named as his agents, conducting operations for him in the village of Hamtramck, two witnesses who he thought "were fairly well posted on values out there," each of whom appraised this property at less than the amount awarded by the jury. These matters, and others which need not be rehearsed were before the jury to pass upon and give such weight as to actual value as in their judgment they were entitled to. The court stated the jury might view the premises if they wished. It is said in plaintiff's brief and not disputed that they did. It seems fairly evident that as a probable result of the rapid growth of Detroit and the then activity in suburban real estate the views of Detroit real estate experts as to what the value of this strip was, or would be, were singularly chaotic and

conflicting beyond reconciling analysis. Their interest, experience, apparent intelligence, and credibility were for the jurors, before whom they appeared as witnesses, to pass upon. There was abundant testimony, if believed, to sustain a verdict for less than the amount, as well as for more. It was the province of the jury to determine the facts and make the award. As intimated by the trial judge in denying defendant's motion to set aside the verdict and judgment of confirmation, what the court might have awarded if authorized and required to pass upon the disputed facts and make the award is not the question, and we cannot conclude from this record as a matter of law that the verdict was so grossly against the overwhelming weight of evidence as to demand reversal.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, and STONE, JJ., concurred. KUHN, J. did not sit.